IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GLENDA FAYE BURCHFIELD          )
                                )
v.                              )    No. 3:06-0824
                                )    Judge Wiseman/Bryant
MICHAEL J. ASTRUE, Commissioner of )
Social Security[1]              )


To: The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

## I.  Introduction

Currently pending in this case for Social Security disability benefits are plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) and defendant's motion for reversal and remand of his decision denying benefits, pursuant to the fourth sentence of 42 U.S.C. § 405(g) (Docket Entry No. 18).  Plaintiff has filed a response to defendant's motion (Docket Entry No. 19), wherein she contends that further fact-finding on remand is unwarranted, as an award of benefits is justified by the existing evidence of record.  Defendant has filed a reply to plaintiff's response (Docket Entry No. 20).  For the reasons given below, the Magistrate Judge recommends that the decision of the Commissioner be REVERSED pursuant to the

---

[1]Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of Social Security on February 12, 2007, and is "automatically substituted" as party defendant in this case, pursuant to Fed.R.Civ.P. 25(d)(1).

1

agreement of the parties, but that the Commissioner's motion otherwise be DENIED; that plaintiff's motion for judgment be GRANTED; and, that this case be REMANDED to the Commissioner for an immediate award of disability insurance benefits from January 31, 2003.

## II.  Discussion

Defendant, in his motion for remand, concedes this litigation to plaintiff, admitting that the decision of the Administrative Law Judge ("ALJ") is indefensible as written. "For cause, the Defendant would show that the agency, after further review of this matter, believes that remand is appropriate in order to (1) update the medical record, (2) review the effects of Plaintiff's obesity, and (3) permit [the] Administrative Law Judge to compare the established residual functional capacity with the job duties of Plaintiff's previous work experience, and (4) obtain vocational expert testimony if necessary." (Docket Entry No. 18)  As mentioned above, plaintiff's response to these assertions is that the record as it stands adequately supports her entitlement to benefits. Defendant's reply brief merely reiterates the necessity that plaintiff's obesity be considered by the ALJ in the first instance, along with the duties and demands of plaintiff's past relevant work vis-à-vis her residual functional capacity.

2

Defendant's reply also notes the limited circumstances in which the Sixth Circuit and other circuit courts of appeal have approved a judicial award of benefits, citing, e.g., Faucher v. Sec'y of Health & Human Servs., 17 F.3d 171 (6th Cir. 1994).

In Faucher, the Sixth Circuit Court of Appeals addressed the issue of ". . . what a district court should do once a determination is made that an ALJ erroneously applied the regulations and the [Commissioner]'s denial of benefits therefore must be reversed", concluding that a remand for further fact-finding is appropriate unless ". . . all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." Id. at 173, 176. Moreover, the Faucher court stated that

> [W]hen the [Commissioner] misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and his decision therefore must be reversed, the appropriate remedy is not to award benefits. ... A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking.

Id. at 175-176 (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

Here, defendant's motion for remand is properly made under the fourth sentence of 42 U.S.C. § 405(g), which states that the district court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

3

Social Security, with or without remanding the cause for a rehearing." The parties agree that reversal of the Commissioner's decision is warranted here. They do not agree as to the sufficiency of the current record to establish disability. Upon reviewing the record, the undersigned finds that the proof of disability in this case is overwhelming.

Plaintiff's medical dossier includes the diagnosis and treatment of physical conditions associated with her left ankle, lumbar spine, cervical spine, right (dominant) hand and wrist, and left elbow, as well as mental conditions including generalized anxiety, panic disorder, agoraphobia, depressive disorder, and post-traumatic stress disorder. The medical evidence was comprehensively treated in plaintiff's brief (Docket Entry No. 13 at 3-14), from which the following excerpts are deemed instructive:

Regarding plaintiff's **lumbar spine,**

On November 20, 1992 David W. Gaw, M.D. performed a percutaneous diskectomy at L4-5. (R203). On August 19, 1993 Dr. Gaw performed a lumbar laminectomy with L4-5 disc excision. (R116)

On May 26, 2004 the Plaintiff presented to Ernest Jones, M.D., primary care physician, with complaints of back pain radiating into her legs. She said "...at times hurts to sit and then hurts to stand." Dr. Jones's examination revealed "Mild tenderness in low back straight leg raise positive at approx 60 degrees." He diagnosed "Low back pain-chronic" and prescribed Ultracet. (R299)

Roy C. Terry, M.D., Tennessee Orthopedics, began his treatment of the Plaintiff on June 17, 2004. Dr.

4

Terry noted that the Plaintiff had four prior surgical procedures to her back.  Following his physical examination of the Plaintiff, Dr. Terry wrote to Dr. Jones:

> "Her lumbar spine is probably the most difficult problem and the one which I will least be able to help her with.  She does have significant degenerative changes that are present there.  Over time, this may give her problems and she may need a fusion.  However, at this point I would recommend the usual non-operative course of care for her condition."  (R392).

A CT of the Plaintiff's lumbar spine on June 30, 2004 found:  "Spondylolysis is seen at L3-4, L4-5 and L5-S1 with disc space narrowing at all three levels with encroachment on the spinal canal and neuroforamina to the left at L4-5."  (R228)

On July 19, 2004 the plaintiff presented to Dr. Jones with complaints of "low back pain worse with activity and relieved at rest".  His examination revealed "Tenderness to palpation in paraspinous muscles in LS spine region.  SLR is negative pain is greater in extension more than flexion. . ."  He diagnosed "Pain low back" and prescribed Ultram. (R298)

On August 3, 2004 Dr.  Terry informed the plaintiff "The patient does not have anything at this point really that I can offer her as far as her back, except for consideration of possibly doing some kind of decompression.  At this point, I would not recommend it."  He prescribed Ultram.  (R385)

On September 13, 2004 a physical consultative examination was performed by Roy Johnson, M.D.  His physical examination found:  "Right healed surgical scar, lumbar area.  Tenderness to palpation L4-L5 paraspinal area.  Flexion 45 degrees, extension zero degrees, right and left lateral flexion 20 degrees bilaterally.  Supine and seated straight leg raise are negative bilaterally."  Dr. Johnson's impression included "Low back syndrome with radiculopathy. . . History of severe arthritis."  (R231-232)

Dr. Jones's objective findings on October 18, 2004 included "Decreased lumbar range of motion, tenderness

to palpation of lumbar paraspinous musculature. Paraspinous musculature spasm (+). Nerve root stretch tests negative. Straight leg raise and other tests causing spinal motion increase low back pain, but not leg pain." He diagnosed "Lumbar strain" and prescribed Ultram. (R296-297)

On January 13, 2005 Dr. Jones's examination found "Decreased lumbar range of motion, tenderness to palpation of lumbar paraspinous musculature. Paraspinous musculature spasm (+). Nerve root stretch tests negative. Straight leg raise and other tests causing spinal motion increase low back pain, but not leg pain." He diagnosed "Lumbar strain" and prescribed Ultram. (R294-295)

On April 6, 2005 Dr. Jones diagnosed the plaintiff with "Lumbar strain" following his examination which revealed "Decreased lumbar range of motion, tenderness to palpation of lumbar paraspinous musculature. Paraspinous musculature spasm (+). Nerve root stretch tests negative. Straight leg raise and other tests causing spinal motion increase low back pain, but not leg pain." He prescribed Ultram. (R292-293)

Having examined the plaintiff on April 14, 2005 Dr. Terry noted: "She has osteoarthritic changes in her lumbar spine that appears to be causing significant difficulties with lifting, carrying, and other activities such as that. Twisting and bending is also a big problem for her." (R374)

On June 30, 2005 Dr. Terry found that the plaintiff had "multiple joint type issues." In an effort to "identify what is going on with her," Dr. Terry ordered lab studies which showed her rheumatoid factor to be 29, C reactive protein 1.68, uric acid 6.3," sed rate 30, and platelet count 402. He noted that the plaintiff had "multiple problems with her arthritis. She continues to have problems and a rheumatology consult may at some point be necessary for helping managing and making sure there is nothing further going on to cause all these multiple joint arthralgias." (R367)

On August 25, 2005 Dr. Terry ordered a MRI on the plaintiff's lumbar spine. (R363) The impression of the MRI performed on August 29, 2005 was: "Small protruded

6

disk with effacement of the dural sac and neural foramina to the left at L4-L5;" "Desiccation of the disk at L4-L5 and L5-S1;" and "Spondylosis at L4-L5 and L5-S1." (R362)

Regarding plaintiff's **left ankle,**

In 1991 the plaintiff suffered an ankle fracture and had surgery requiring the insertion of screws. Due to the plaintiff's pain on September 8, 2000 Rodger Zwemer, M.D., McMinnville Orthopaedic Clinic, performed surgery to remove the screws. (R128 and 130)

Roy Terry, M.D., Tennessee Orthopedics, began his treatment of the plaintiff on June 17, 2004. His physical examination revealed:
"Her ankle on the left side is significantly a problem for her. She has what appears to be significant motion loss and pain on attempted range of motion, as well as what appears to be palpable osteophytic spurs off the area of the ankle. She has well healed incisions with some prominence of metal that is present. She does not have evidence of more acute problems. These appear to be more chronic conditions with her ankle. The right side appears to have good function of the ankle as far as motion and does not have the palpable prominences she has on the left." (R390)

In a June 17, 2004 letter to Ernest Jones, M.D., the plaintiff's primary care physician, Dr. Terry stated: "She also has significant osteoarthritis of her ankle, for which at this point really the only thing I could recommend would be consideration for some type of fusion of this joint." (R392)

On August 3, 2004 Dr. Terry noted "She also has continued complaints and problems with her ankle. I have asked for a CT of her ankle to be done to try and evaluate whether or not she has evidence of any failure of union or evidence of any problems with that at all." He prescribed Ultram. (R385)

On August 19, 2004 a CT of the plaintiff's ankle found: "There are severe degenerative changes around the ankle joint with loss of joint space between the tibia and talus. . . There are screws identified within the fibula." (R227)

Following his examination of August 31, 2004 Dr.

7

Terry noted:

> "Ms. Burchfield is a patient who has had
> problems with what appears to be severe ankle
> osteoarthritis.  We have recommended surgery
> vs. an injection vs. a brace.  She has
> already got the brace and that has helped a
> little bit.  The injection she really doesn't
> want, and surgery she doesn't want to do now.
> She is having a lot of issues at home.  She
> also has stage II carpal tunnel syndrome, and
> this may need to be treated also.  I have
> told her to try and put off having the
> surgery on her ankle as long as possible.
> This will allow her to be as active as she
> can.  She does have some motion there.  I
> have told her that even with fixing this she
> will not have a normal ankle and will
> continue to have difficulties, and will
> probably limp and still have some pain.
> However, hopefully I think we can relieve a
> lot of the pain by fusing it if it will fuse
> without difficulties.  Totally, she will be
> off about three months from walking on this
> side."  (R384)

On September 13, 2004 a physical consultative
examination performed by Roy Johnson, M.D. found "Left
ankle full range of motion.  There is a medial and
lateral well-healed surgical scar noted.  Gait: Slow
and guarded.  The patient is unable to perform heel-toe
walk, could squat and rise, could balance on the right
foot, not on the left."  (R231)

During her September 30, 2004 mental consultative
examination Linda Blazina, Ph.D. noted "Her gait was
slow."  (R262)

Following his examination of the plaintiff on
January 13, 2005 Dr. Terry prescribed Mobic and noted:
> "Her ankle has significant osteoarthritis.
> At this point, I would not recommend for her
> to have any kind of surgery on it, but if she
> did, a fusion would probably be the ideal
> procedure.  She has significant changes,
> significant problems.  Exam today shows her
> to have loss of motion, pain, tenderness.  No
> neurological deficits appear to be present...
> The patient basically is continuing to

8

complain about lots of pain that is unabated, continues to be worse with activity, and there is not really anything we can do for her much at this point. She does continue to complain about a lot of swelling." (R375)

Having examined the plaintiff on April 14, 2005 Dr. Terry noted "She has significant osteoarthritis of her left ankle and needs a surgical procedure on that side." (R374)

Regarding plaintiff's **mental impairments,**

On March 22, 2000 the plaintiff was treated at the Baptist DeKalb Hospital with a diagnosis of "Acute anxiety" and was prescribed Xanax and Zoloft. (R189-190)

Doug G. Hooper, M.D. treated the plaintiff on March 1, 2002 and diagnosed "Panic disorder." His prescriptions were an increase in Paxil and additions of Ativan and Buspar. (R222)

On May 8, 2002 Dr. Hooper diagnosed "GAD č Panic Attacks" and increased the plaintiff's Buspar and Ativan. (R221)

On October 8, 2002 the plaintiff was admitted to the Baptist DeKalb Hospital when she presented to the emergency room with "dizziness and feelings of palpitations and weakness." She was evaluated for "cardiac arrhythmias" and "an MI," which were ruled out. Upon discharge she was prescribed Atiavan and Tenormin. (R144-170)

On October 24, 2002 Frieda Whitt, LPC, Hendrick Counseling Services, evaluated the plaintiff concerning her panic attacks and diagnosed a current Global Assessment of Functioning (GAF) of sixty-five (65). (R212-216)

On December 12, 2002 Dr. Hooper diagnosed "Panic d/o." (R220)

On September 19, 2003 Dr. Hooper diagnosed "Panic disorder" and prescribed Lexapro. (R219). On September 30, 2003 Dr. Hooper again diagnosed "Panic D/O." (R218)

9

On April 19, 2004 the plaintiff presented to Ernest Jones, M.D. with complaints that "When she goes outside or in a crowd she gets panicky." Having evaluated the plaintiff, Dr. Jones diagnosed Panic Disorder and Agoraphobia and prescribed Lexapro and Ativan. (R300) On July 19, 2004 Dr. Jones diagnosed "Anxiety syndrome" and prescribed Lexapro and Ativan. (R298)

On September 13, 2004 Roy Johnson, M.D., a physical consultative examiner, diagnosed "History of anxiety disorder." (R232)

On September 30, 2004 Linda Blazina, Ph.D. performed a mental consultative examination. She noted "her mood was somewhat depressed. . . She was tearful several times. Her affect was mood congruent. . . Her immediate memory functioning is below average. She repeated three of three words immediately and recalled non of three after five minutes. Her attention and concentration skills appear to be mildly impaired at the present time. She completed serial 7 calculations for five iterations and two errors, and was very slow in doing so." (R262) She further noted "She appears to have mild attention and concentration problems as well as mild difficulties with her immediate memory functioning. . . Her stress tolerance appears to be quite low at the present time." (R264-265) Her diagnostic impression included "Panic Disorder without agoraphobia," "Depressive disorder, NOS," and a current Global Assessment of Functioning (GAF) of sixty-five (65). (R265) She assessed:

> "At the present time, Ms. Burchfield's ability to understand and remember is felt to be mildly limited due to her difficulty with her new learning abilities and immediate memory functioning. Her ability to sustain her concentration and persistence is felt to be moderately limited due to her depression and her report of panic attacks on a daily basis. Her social interaction abilities are felt to be moderately limited as well due to her anxiety. Her ability to adapt to change in a work routine and tolerate stress is felt to be moderately to severely limited due to her panic attacks. She also reportedly has stopped driving her car over the past year and will now only go out to the grocery store

if someone accompanies her." (R264)

On November 18, 2004, January 13, 2005, and April 6, 2005 Dr. Jones prescribed Lexapro and Ativan. (R293, 295 and 297)

On April 18, 2005 the plaintiff received treatment from Cumberland Mental Health Services whose diagnosis included "Panic Disorder With Agoraphobia," "Post Traumatic Stress Disorder," "Depressive Disorder NOS" and a current Global Assessment of Functioning (GAF) of forty-five (45). The plaintiff reported "Client reports her two sons were involved in MVA and she now has "a great fear of vehicles." Client reports her younger son was hurt in MVA and her older son "almost burned to death" in MVA." A mental status exam found that her behavior and mood were anxious and her insight was limited. A functional assessment, The Tennessee Clinically Related Group (CRG) Form, opined that the plaintiff had a moderate limitation in her activities of daily living, concentration, task performance, and pace and adaptation to change and marked limitation in her interpersonal functioning. She was advised to continue her prescriptions of Lexapro an Ativan and was additionally prescribed Cymbalta and Lunesta. (R342-349)

On July 20, 2005 and August 31, 2005 Dr. Jones diagnosed "Panic Disorder" and "Agoraphobia." He prescribed Lexapro and Ativan. (R288-289)

On August 31, 2005 the plaintiff presented to the emergency room of the University Medical Center where it was noted "SHE ARRIVES SHAKING, C/O SHORT OF BREATH, ANXIOUS, AND CRYING." It was further noted that she had a history of anxiety attacks and a known stressor of having spoken with her ex-husband concerning child support. She had contacted Cumberland Mental Health Services and was advised to go to the emergency room. Vistaril and Ativan were administered. Upon discharge she was diagnosed with "Acute Anxiety." (R303-312)

On September 14, 2005 Cumberland Mental Health Services diagnosed "Panic Disorder With Agoraphobia," "Post Traumatic Stress Disorder, Chronic, With Delayed Onset," "Depressive Disorder NOS" and a current Global Assessment of Functioning (GAF) of forty-five (45). Her prescription of Lexapro was increased. She was prescribed Neurontin. She was advised to continue her prescription of Ativan. (R339-340)

11

(Docket Entry No. 13 at 3-7, 9-12)

        The ALJ was of the opinion that plaintiff's left ankle impairment was her "primary problem," though he rather dismissively characterized her severe osteoarthritis and osteophytic spurring as merely "residuals of an old left ankle fracture." (Tr. 30) Despite plaintiff's statement that she "does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments" (Docket Entry No. 19 at 3), comparison to § 1.02 of the listings is instructive of the severity of her ankle impairment. That section lists the criteria for presumptive disability due to "[m]ajor dysfunction of a joint(s) (due to any cause)," as follows:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>     A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2B; . . .

        The record supports the presence of chronic joint pain and stiffness with signs of limitation of motion. (E.g., Tr. 391 ("She has what appears to be significant motion loss and pain on attempted range of motion, as well as what appears to be palpable osteophytic spurs off the area of the ankle. ... These appear to

12

be more chronic conditions with her ankle.")).  As to the
requirement of gross anatomical deformity, this presumably refers
to deformity within the joint itself, rather than protuberances
from the surface of the joint or from the bones and tendons
surrounding the joint.  In this case the integrity of the joint
itself was maintained with the surgical plates and screws
inserted in 1991; the screws were subsequently removed due to
irritation.  (Tr. 128-32)  Nevertheless, it is perhaps equally
significant that the imaging of plaintiff's ankle in 2000 and
2004 revealed marked osteophytic spurring and the presence of
sizeable cysts in the area of the joint, described as "severe
degenerative changes" (Tr. 227), as well as "irregularity of the
articular surface of the tibia," "anterior and posterior
spondylosis," and "anterior enthesiophyte" raising the question
of possible *joint impingement*, a phenomenon noted to be
compatible with plaintiff's clinical symptomatology (Tr. 132).
In addition, the 2004 CT scan revealed not just joint space
narrowing, but "[c]omplete loss of cartilaginous joint space ...
with vacuum disc phenomena between the tibia and talus."  (Id.)
Finally, while the record does not reflect plaintiff's
prescription for or use of a cane or walker to assist in
ambulation,[2] there are notations by both consultative examiners

---

[2]There is a marginal notation in plaintiff's October 2005 letter to the
Appeals Council which appears to indicate that plaintiff uses a cane to help
her stand (Tr. 19).  However, the undersigned notes that this unsworn
allegation was not before the ALJ, nor is it confirmed by any other evidence

Case 3:06-cv-00824   Document 21   Filed 03/13/07   Page 13 of 21 PageID #: 97

of plaintiff's slow, guarded gait (Tr. 231, 262), with the consulting physician noting that she could not balance on the left foot (Tr. 231) and Dr. Terry observing that she could not stand on her ankle (Tr. 391). Plaintiff further testified and otherwise reported that she had to move to a single-level home in May of 2005 because her ankle would no longer allow her to navigate a single flight of stairs (Tr. 339, 432). This functional loss would appear to correspond with the regulatory description of ineffective ambulation as an inability to "sustain[] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living,"[3] exemplified by, *e.g.*, "the inability to walk a block at a reasonable pace on rough or uneven surfaces..." and "the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.

In short, plaintiff is significantly limited by her left ankle impairment and the resulting pain and functional loss. The only surgical alternative available to plaintiff appears to be fusion of the ankle joint (e.g., Tr. 375, 422), which would itself likely result in disability pursuant to § 1.03 of the listings, pertaining to "surgical arthrodesis of a major weight-

of record.

[3]The regulations clarify that "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation."

14

bearing joint."

　　　　Compounding plaintiff's difficulty with the exertional and positional requirements of work at any level are her continuing problems with her lower back, specifically the fourth and fifth lumbar discs.  The record indicates that plaintiff has already endured as many as four "failed" back surgeries (Tr. 376, 391), including most recently a percutaneous diskectomy at L4-5 in 1992 and a lumbar laminectomy with L4-5 disc excision in 1993 (Tr. 116, 203).  An MRI taken August 29, 2005, yielded the following impressions:  "small protruded disk with effacement of the dural sac and neural foramina to the left at L4-5," "desiccation of the disk at L4-L5 and L5-S1," and "spondylosis at L4-L5 and L5-S1" (Tr. 362).  A CT scan taken one year prior, on June 30, 2004, revealed "an encroachment on the neuroforamina to the left into the spinal canal with a probable calcified disc at L4-5," with spondylolysis and disc space narrowing at L3-4, L4-5, and L5-S1 (Tr. 228).  Plaintiff's back pain has been reproduced at times on straight leg raise testing (Tr. 292, 294, 296, 299), and paraspinous muscle spasm has been appreciated on a few occasions (Tr. 292, 294, 296).  While it does not appear that plaintiff has unremitting back pain (e.g., Tr. 300, 304-05), the extent of mechanical and especially arthritic pain and concomitant loss of motion that she suffers has been well documented and treated with the narcotic painkiller Tramadol

15

(under the trade names Ultram and Ultracet) (Tr. 77, 102, 109, 113, 292-99, 385), an opiate used to treat moderate to moderately severe pain.[4] The fact that a claimant may have good days and bad days with regard to her level of pain does not direct the conclusion that the pain is not disabling; "[t]he key question is whether Plaintiff is able to engage in employment on a 'regular and continuing basis.'" Meece v. Barnhart, 192 Fed.Appx. 456, 466, 2006 WL 2271336 (6th Cir. Aug. 8, 2006)(quoting 20 C.F.R. § 404.1545(b)).

Even if she were *physically* able to perform the range of sedentary work which the consultative examiner identified on a regular and continuing basis, plaintiff has a history (since at least 2000) of emergency room visits and other treatment for acute anxiety, panic attacks, agoraphobia, and post-traumatic stress disorder (Tr. 189-90, 145-52, 170, 212-16, 218-19, 221-22, 232, 288-89, 303-12, 339-49). Treating physician Dr. Doug Hooper documented the worsening of plaintiff's panic attacks in March of 2002 (Tr. 222), increased her dosage of psychotropic medication at that time and again in May of 2002 (Tr. 221), made a note to refer plaintiff to a psychiatrist in December of 2002 (Tr. 220), and made a note in September of 2003 that the complex of symptoms associated with her panic disorder had persisted for over a year and were slowly progressive (Tr. 218). On September 30, 2004,

---

[4]http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

the consultative psychological examiner assessed several work-related limitations owing to plaintiff's anxiety and panic disorder, including the assessment that "[h]er ability to adapt to change in a work routine and tolerate stress is felt to be moderately to severely limited due to her panic attacks." (Tr. 264) On April 18, 2005, Cumberland Mental Health Services found plaintiff's interpersonal functioning to be markedly limited due to panic attacks, assessed her functioning as 45 (denoting "serious symptoms" or "serious impairment in social, occupational, or school functioning") on the Global Assessment of Functioning ("GAF") scale,[5] and continued her medical treatment with the anti-anxiety drugs Lexapro and Ativan while additionally prescribing Cymbalta and Lunesta for depression and insomnia, respectively (Tr. 342-49). Five months later, on September 14, 2005, Cumberland Mental Health Services again assessed plaintiff's GAF as 45, increased her Lexapro dosage, maintained her prescription for Ativan, and added Neurontin, an anticonvulsant (Tr. 339-340). Plaintiff testified before the ALJ and reported to her caregivers that she had mild panic attacks at least as often as twice a week, including the occasions when she gets in a car and leaves her house, and severe, incapacitating panic attacks about once every two weeks (Tr. 339, 345, 426-28).

---

[5]Plaintiff's GAF of 45 falls within the prescribed range of "41-50"; a score in the range of "51-60" indicates "moderate symptoms," which are notably exemplified by, e.g., "occasional panic attacks." <u>Diagnostic and Statistical Manual of Mental Disorders IV-TR</u> 34 (4th ed. 2000).

These progressively more severe panic attacks appear to be chief among the reasons that plaintiff was forced to leave her job in January 2003, along with the worsening pain and dysfunction of her ankle and lower back (Tr. 17, 263, 346).

In sum, it appears that in January 2003, plaintiff succumbed to the worsening symptoms associated with these and other impairments, including symptoms of carpal tunnel syndrome in her right arm (Tr. 135) and neck pain from degenerative disc disease in her cervical spine (Tr. 135, 172). The undersigned finds the foregoing proof of disability to be overwhelming, particularly in light of the opinions of the treating physician and treating mental health professionals in accord (Tr. 351-55, 356). Even the one-time consultant opined that plaintiff would be limited to less than the full range of sedentary work, without considering her mental limitations, and while acknowledging that "her work activity should not exceed any restrictions placed on her by [her] treating physician." (Tr. 232)

In view of the medical evidence of record, it would not appear that any unresolved factual issues would prevent a judicial award of benefits, unless the evidence of plaintiff's actual activity level departs significantly from the picture painted by the other record evidence. However, contrary to the ALJ's interpretation of her professed daily activities, it does not appear that the activities reported to the psychological

consultant (Tr. 263-64),[6] or the activities reported elsewhere in
the record, constitute anything more than simple household
functions such as the Sixth Circuit has long held to be not
necessarily incompatible with claims of total disability. See
Meece v. Barnhart, supra (citing, e.g., Walston v. Gardner, 381
F.2d 580, 586 (6th Cir. 1967)("The fact that appellant can still
perform simple functions, such as driving, grocery shopping, dish
washing and floor sweeping, does not necessarily indicate that
this appellant possesses an ability to engage in substantial
gainful activity.  Such activity is intermittent and not
continuous, and is done in spite of the pain suffered by
appellant.")).  While there were two isolated references in
plaintiff's medical records, noted by the ALJ, to the effect that

_____

[6]Specifically, Dr. Blazina's report contained the following discussion
of plaintiff's daily activities:

> Ms. Burchfield reported that she is able to dress and bathe
> herself independently.  She had adequate hygiene at the time of
> the evaluation.  She stated that she stopped driving a car one
> year ago due to her panic attacks.  She reported that she is able
> to go grocery shopping, but only if someone accompanies her and
> she does not go shopping alone.  She stated that she has
> difficulty walking or sitting for any period of time due to her
> back problems and also reported difficulty "being in crowds."  She
> stated that she does household chores such as laundry and dusting,
> and does not report requiring any assistance with these
> activities, although she does not report engaging in any heavy
> household chores.  She stated that she cooks daily for herself and
> her daughter.  She reported that she goes to church generally two
> times a month.  She stated that she sees her parents and her two
> adult sons on a regular basis and also stated that she has several
> friends who come to her home to visit with her.  She reported that
> she now does not want to leave her house and tends to isolate
> herself socially, and described herself previously as very active
> stating that she used to drive everywhere, went out with friends,
> and used to square dance.  She stated that she does not currently
> have any hobbies.  She reported that she usually stays at home
> most days and after she gets her daughter ready for school, stays
> in the house and listens to the radio or watches television. ...

19

plaintiff hurt her right ankle while mowing her yard (Tr. 291), and was at one point "having to work for a gentleman cleaning horse stalls because she is trying to raise a 7-year-old daughter" (Tr. 374), plaintiff clarified in her letter to the Appeals Council that when she did mow her yard it would take 4-5 days, and that after she hurt her right ankle doing so, her mother and stepfather took over the mowing duties (Tr. 19); she further clarified that, for a short time, she and her daughter were housed by a family friend in an apartment adjacent to the friend's horse barn, and that in order to try and earn her keep, plaintiff worked with another man, helping him clean a single horse stall once a week (Tr. 17). While plaintiff's letter is admittedly an unsworn, *post hoc* response to the ALJ's decision, the undersigned is satisfied that it at least carries sufficient weight to dispel any notion that there remains unresolved any *essential* factual issue regarding the degree of her functional limitation. In the absence of any such issue, and upon this record which adequately establishes plaintiff's entitlement to benefits as of her alleged onset date of January 31, 2003, the undersigned must conclude that remand for an immediate award of same is appropriate.

### III. Recommendation

In light of the foregoing, the Magistrate Judge

Case 3:06-cv-00824   Document 21   Filed 03/13/07   Page 20 of 21 PageID #: 104

recommends that the decision of the Commissioner be REVERSED pursuant to the agreement of the parties, but that the Commissioner's motion otherwise be DENIED; that plaintiff's motion for judgment be GRANTED; and, that this case be REMANDED to the Commissioner for an immediate award of disability insurance benefits from January 31, 2003.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 13th day of March, 2007.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

21